UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MARK W. KUZAK, ) | CASE NO. 1:13CV754 |
| ) | |
| Plaintiff, ) | MAGISTRATE JUDGE GEORGE J. |
| ) | LIMBERT |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN[1], ) | MEMORANDUM OPINION AND ORDER |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Mark W. Kuzak ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

## I.   PROCEDURAL AND FACTUAL HISTORY

On May 5, 2010, Plaintiff applied for SSI and DIB, alleging disability beginning October 1, 2003. ECF Dkt. #12 ("Tr.") at 142-153. Plaintiff met the insured status requirements of the Social Security Act through September 30, 2008. Tr. at 14. The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 77-79, 100-113. Plaintiff requested an administrative hearing, which was held on November 7, 2011. Tr. at 27-68. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel, Robert A. Mosley, a vocational expert ("VE") and Hershel Goren, M.D., a medical expert ("ME"). On January 26, 2012, the ALJ issued a Decision denying benefits. Tr. at 12-21. Plaintiff filed a request for review, which the Appeals Council denied on February 6, 2013. Tr. at 1.

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

On April 5, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On July 24, 2013, Plaintiff filed a brief on the merits. ECF Dkt. #13. On August 23, 2013, Defendant filed a brief on the merits. ECF Dkt. #15. A reply brief was filed on September 6, 2013. ECF Dkt. #17.

## II. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was thirty-seven years of age on the alleged onset date and forty-five years of age at the hearing, suffered from degenerative disc disease, carpel tunnel syndrome, and antisocial personality disorder, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 14. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525, 404.1526, §416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 15-16.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R. 404.1567(b) and 416.967(b) but with the following limitations: He can frequently use a foot pedal; he can occasionally push and pull with the right upper extremity, but never the left; he can frequently climb ramps or stairs, but never a ladder, rope, or scaffold; he can frequently balance, occasionally stoop, kneel, crouch and never crawl; he cannot look or reach overhead bilaterally; he can frequently handle, occasionally finger and feel with the left hand; he must avoid unprotected heights or workplace hazards; he cannot perform work activity involving arbitration, negotiation, or confrontation; and he may only have superficial interaction with the public. Tr. at 12.

The ALJ ultimately concluded that, although Plaintiff could not perform his past work as a truck driver, laborer, and power washer/steam cleaner, he is able to perform the representative occupations of greeter, usher, and automatic car wash attendant. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III. **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,*

486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**V.    ANALYSIS**

Plaintiff advances five arguments in this appeal. First, Plaintiff contends that the ALJ erred in relying upon the testimony of the ME regarding the treatment for fibromyalgia. Second, Plaintiff asserts that the ALJ violated the treating physician's rule when he did not give controlling weight to the opinion of Jose E. Mendoza, M.D., who opined that Plaintiff's fibromyalgia prevented him from performing full-time work. Next, Plaintiff argues that the ALJ erred in limiting Plaintiff to superficial interaction with the public, but no limitation upon his interaction with supervisors and co-workers. Fourth, Plaintiff contends that his right to due process was violated when the V.E. refused to turn over notes he relied upon during the hearing. Finally, Plaintiff asserts that the ALJ erred when he failed to verify that the V.E.'s testimony was consistent with the Dictionary of Occupational Titles ("DOT")

    **A.    Medical evidence**

Plaintiff initially treated with Daniel J. Holden, M.D., for complaints of hand, wrist, and shoulder pain, which he informed Dr. Holden that he had suffered for the previous three years, on July 21, 2004. Tr. at 719. He later sought treatment with Dr. Holden for hand pain and neck stiffness in 2007. Tr. at 709, 712. Over the course of treatment, Dr. Holden diagnosed Plaintiff with inflammatory polyarthritis, early osteoarthritis, arthralgias (possibly rheumatoid arthritis), osteoarthritis in the hand, post-surgical cervical spondylosis, post-surgical right carpal tunnel syndrome, and migraine headaches. Tr. at 411, 712, 714, 719. It is important to note that Dr. Holden's objective physical examinations consistently yielded normal results and his examinations

as they related to fibromyalgia trigger points yielded no abnormal findings. Tr. at 710, 713, 718, 721.

Plaintiff began treatment with Jose E. Mendoza, M.D., on March 20, 2007 for groin pain. Tr. at 420. Plaintiff reported neck, back, and hand pain. Dr. Mendoza's examination revealed normal musculature, no skeletal tenderness or joint deformity, and normal extremities. Tr. at 420-421. In June of 2008, Dr. Mendoza documented no fatigue, bone/joint symptoms or weakness, normal musculature, and no tenderness or joint deformity. Tr. at 417-18.

In mid-2008, Dr. Mendoza referred Plaintiff to the Comprehensive Pain Care Center, Inc., for headache pain that radiated into Plaintiff's neck and arm. Tr. at 347. Osama Malak, M.D., M.Sc., FIPP, initially evaluated Plaintiff on July 21, 2008, finding, in pertinent part, that Plaintiff's strength, sensation, and reflexes in his arms were within normal limits on both sides. Tr. at 350. Plaintiff had normal sensory responses to light touch and pinprick tests and "all muscles tested were within normal limits." Tr. at 350-351. Dr. Malak diagnosed Plaintiff with cervical spine pain and disc degeneration and migraine headache. Tr. at 351.

Follow-up examinations with Dr. Malak in August and November of 2008 revealed normal sensory functioning, normal head/neck, and intact fine motor skills. Tr. at 351-53, 356. Plaintiff received cervical steroid injections in September and October of 2008 for brachial neuritis/radiculitis. Tr. at 358-60. Plaintiff left the clinic on both occasions with normal strength, gait, and could walk appropriately without assistance. Tr. at 359-260. In November of 2008, Plaintiff reported less pain in his head and neck. Tr. at 356. Plaintiff further reported that a cervical steroid injection "helped his neck and [left upper extremity] pain significantly," but that he still had some pain in his left shoulder. Tr. at 357. Dr. Malak prescribed Robaxin to Plaintiff's prescriptions for Lyrica, Cymbalta, Lodine, and Ultram.

On August 7, 2009, Dr. Mendoza's physical examination again revealed that Plaintiff had normal musculature, no skeletal tenderness or joint deformity, and normal extremities. Tr. at 425-26. Although Dr. Mendoza assessed Plaintiff with neck pain, headache, and "fatigue and malaise, other," Tr. at 426-427, under "review of systems" Dr. Mendoza noted that Plaintiff was "negative for fatigue…" Tr. at 425. An examination in early September of 2009 similarly revealed that

-5-

Plaintiff was in no apparent distress, had normal musculature and no skeletal tenderness or joint deformity; Dr. Mendoza assessed Plaintiff with shoulder pain. Tr. at 429. Later that month, Dr. Mendoza noted that Plaintiff reported no fatigue, and no bone/joint symptoms or weakness. Tr. at 431. His physical examination of Plaintiff again revealed normal musculature and no skeletal tenderness or joint deformity. Tr. at 432.

On November 6, 2009, Dr. Mendoza conducted a physical examination that revealed that Plaintiff had normal musculature, no skeletal tenderness or joint deformity, normal extremities, but posterior tenderness in the spine. Tr. at 443. Later that month, Dr. Mendoza noted posterior tenderness in Plaintiff's spine in his physical examination notes. Tr. at 435. He assessed Plaintiff with neck pain, shoulder pain, and pain in the hand joint. Tr. at 435.

Plaintiff began treating at the Veteran's Administration ("VA") in January of 2010. Tr. at 505. During an initial examination, Anuradha Yalamanchili, M.D., assessed Plaintiff to be in no distress, with no spinal tenderness, paraspinal tenderness and normal gait. Tr. at 506-07. During an April 6, 2010 examination with Ramsey N. Saad, M.D., Plaintiff reported that he owed $81,000.00 in child support, and that he believed if the VA found him unable to work he would not be responsible for paying the outstanding child support. Tr. at 477, 480. Dr. Saad noted twice that Plaintiff "ha[d] clear secondary gain issues from assuming the sick role as he will need to pay his ex-wife $81,000 if deemed able to work." Tr. at 477, 480.

Dr. Saad's examination revealed that Plaintiff was well nourished/developed, in no acute distress, and "[a]ppear[ed] comfortable and occasionally laughing" Tr. at 479. Plaintiff's gait was normal, without antalgia or foot drop. Tr. at 479. His range of motion was intact for all large joints of the extremities, his sit-to-stand movement was unremarkable, his deep knee bend was symmetric and full, and he was able to walk on his heels and his toes without difficulty. He had some limitation of motion in his cervical and lumbar spine due to tenderness and pain. Tr. at 479-80. Plaintiff's extremity strength was full (5/5) and reflexes were normal; his straight leg-raising ("SLR") test[2] was

---

[2]The SLR test detects nerve root pressure, tension, or irritation. With the patient supine or sitting and the knee fully extended, the physician raises the involved leg from the examining table. A positive SLR test requires reproduction of leg pain at an elevation of less than seventy degrees. A positive SLR is the single

negative, and, despite hyposthesia (diminished sensation) over his left palm, his pinprick and light touch sensation were intact in all areas. Tr. at 480.  The health summary indicates that Plaintiff did not have any goals for pain psychology and would not be scheduled for a follow-up appointment.

Psychiatrist Catherine A. Nageotte, M.D., conducted an initial mental status examination of Plaintiff on February 8, 2010. Tr. 500-501. Plaintiff's affect was mildly gruff and sarcastic, but cooperative; his gait and station were normal; he had no suicidal or homicidal ideation; no history of violence; and his thought process was logical and goal directed. Tr. at 500. He could quickly and accurately perform serial sevens; had positive self-esteem; his immediate recall was intact; he had the capacity for insight and critical self-reflection; his judgment was sound in hypothetical situations; and his intelligence was assessed as average. Tr. at 500.

Dr. Nageotte diagnosed Plaintiff with substance-induced mood disorder with sleep disturbance due to the opiate analgesic he was taking; alcohol dependence in almost complete remission; and possible versus probable secondary gain issues related to back child support he owed. Tr. at 501. She also wanted to rule out Cluster B personality traits versus a personality disorder, and assigned a Global Assessment of Functioning ("GAF") score of 50.[3]

Dr. Nageotte examined Plaintiff again on March 8, 2010, noting that his affect was angry and sarcastic, his thought process was goal directed, and he had normal gait and station. Tr. at 493. Her diagnoses and GAF assessment remained the same, with the additional diagnosis of antisocial personality disorder. Tr. at 493-94.

Social Worker Kathleen F. Cooney, LISW-S, conducted a psychiatric assessment of Plaintiff on March 29, 2010. Tr. at 486-489. Her examination revealed that Plaintiff was groomed, he made good eye contact, but had an irritable/loud/defensive demeanor and an annoyed/defensive affect. Tr. at 485. Plaintiff admitted to not "having a great deal of love for the rules." Tr. at 489.  Ms. Cooney

---

most important sign of nerve root pressure produced by lumbar disc herniation. Richard H. Rothman M.D., Ph.D., and Frederick A. Simeone, M.D., The Spine, 696-98 (3rd ed. 1992).

[3]The GAF score assesses an individual's psychological, social and occupational functioning on a hypothetical continuum of mental health-illness. Am. Psychiatric Ass'n, DSM-IV-TR, 34 (Fourth ed., Text Revision, 15th Printing, 2011) ("DSM-IV"). A GAF score in the range of 41-50 denotes "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Id. (emphasis in original).

observed that Plaintiff's focus is "on himself and his own problems and issues and he does not look at the consequences for others in his life, i.e. his 17 y/o daughter and his ex-wife. Tr. at 489.

Plaintiff's speech was normal, his mood was irritable, and his thought process was linear, logical, and goal directed. Tr. at 486. His insight and judgment were fair. Tr. at 486. Ms. Cooney diagnosed Plaintiff with depression, pain problems, tobacco use, Cluster B traits (noting personality disorder was likely), and assigned a GAF score of 50. Tr. 488-489.

On April 2, 2010, Cynthia P. Vankeuren, Psy.D., observed that Plaintiff was casually, cleanly, and neatly dressed; alert; cooperative; and made good eye contact. Tr. at 483. Plaintiff did not demonstrate pain behaviors during the appointment, and had a bright affect. Tr. at 484. Dr. Vankeuren's diagnostic impressions were that Plaintiff saw himself as a victim and that he was invested in playing "the sick role." Tr. at 484. She also noted concerns about Plaintiff's secondary gain issues – namely that he "owe[d] a considerable amount of money in child support and would be expected to pay the money if his providers deem[ed] him fit for employment." Tr. at 484. She concluded that Plaintiff had no goals for pain psychology and would not be scheduled for follow-up Tr. at 484.

Plaintiff next saw Dr. Mendoza to obtain disability paperwork on June 15, 2010. Tr. at 437. Dr. Mendoza's physical examination revealed neck stiffness, but no skeletal tenderness or deformity, tender/mild pain in the cervical spine with motion, and tenderness in the lumbar and thoracic spine, shoulders, elbows, hips, and left rib. Tr. at 439. Plaintiff had no motor or sensory deficits. Tr. at 439. Dr. Mendoza assessed Plaintiff with neck pain, headache, and "fatigue and malaise, other." Tr. at 439. Plaintiff presented to Dr. Mendoza again in August complaining of left arm pain. Tr. at 614. Plaintiff reported no fatigue but complained of back pain and neck stiffness. Tr. at 614-15. Dr. Mendoza's physical examination revealed that Plaintiff's neck range of motion had decreased; his spine inspection revealed no abnormality but was positive for posterior tenderness, paravertebral muscle spasm, and thoracic and lumbosacral tenderness. Tr. at 616. Plaintiff had no skeletal tenderness or deformity, and moderate pain with motion; he had no sensory loss or motor weakness, but numbness in his left arm.

Dr. Mendoza completed a fibromyalgia questionnaire on June 15, 2010. Tr. at 408-10. He noted diagnoses of neck, shoulder, and upper and lower back pain, and that Plaintiff had presented with fibromyalgia symptoms since 2007. Tr. at 408, 410. Dr. Mendoza also noted that Plaintiff had widespread pain with neck and back pain. Tr. at 408-409. He indicated that Plaintiff could not sustain an eight-hour work day, 40 hours per week in a seated position, and that Plaintiff's symptoms would interfere with his ability to focus on work-related tasks for at least two hours at a time, would vary from day to day, and result in multiple sick days per month. Tr. at 410.

During a follow-up therapy session with Ms. Cooney on June 21, 2010, Plaintiff reported feeling "pretty good." Tr. at 463-464. An examination revealed that he was groomed, made good eye contact, was cooperative, had normal speech, euthymic affect, "pretty good" mood, linear, goal-directed thought process, and fair insight and judgment. Tr. at 463. Plaintiff reported that he could manage his mood with medications. Tr. at 463. Ms. Cooney assessed Plaintiff with a GAF score of 53.[4] Tr. at 576

On June 29, 2010 Plaintiff reported to Dr. Saad that his low back pain was "much better" as a result of physical therapy, but that he still had neck pain. Tr. at 453. Plaintiff reported that Cymbalta and his TENS unit helped with his pain, but that when his dosage had increased, he experienced fatigue and gastrointestinal upset. Tr. at 453-54. Dr. Saad's examination revealed that Plaintiff had full strength and normal reflexes in his arms and legs and an SLR was negative. Tr. at 454. Plaintiff had hyposthesia over his left palm, which Plaintiff reported was stable, as well as over the left lower leg in a patchy distribution. Tr. at 454. Dr. Saad assessed Plaintiff, in pertinent part, with cervical radiculopathy and postlaminectomy syndrome that had improved with prior steroid injections, low back pain that improved with physical therapy and use of a TENS unit, and noted that Plaintiff was interested in obtaining another cervical steroid injection. Tr. at 455.

Plaintiff underwent physical therapy for his back, neck, and upper extremity pain from April to November 2010, and responded well. Tr. 466-69, 471, 544-47, 549-51, 557-58, 562-63, 565-66,

---

[4] A GAF score in the range of 51-60 denotes "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning…" Id. (emphasis in original).

573, 579-80, 582, 584, 652. He also underwent aquatic therapy in 2011, which resulted in increased strength and range of motion and decreased arm pain. Tr. at 654-62.

On January 18, 2011, a physical examination by Dr. Saad revealed that Plaintiff was in no acute distress, was well nourished and developed, alert and awake, and appeared comfortable . Tr. at 650. His gait was normal without antalgia, his upper back was tender with limited range of motion, and his lower back had limited range of motion due to pain. Plaintiff had full strength (5/5) and normal reflexes in his arms and legs, and a negative SLR test. Tr. at 650-51. He had hyposthesia over his left palm and left lower extremity in a patchy distribution. Tr. at 651. On February 11, 2011, Plaintiff reported that pain in his upper back had been reduced from 8/10 to 2/10 and sometimes to no pain at all. Tr. at 644.

On June 22, 2011, a mental status examination conducted by Ms. Cooney revealed that Plaintiff was "well groomed and very tan" and made good eye contact; and was cooperative and talkative with normal speech. Tr. at 630. He had a euthymic affect; a good mood; linear, logical, and goal directed thought process and content; and fair/good insight and judgment. Ms. Cooney noted that Plaintiff was "making good progress in mood management by use of medications and therapy" and that he made "no reports of anger outbursts." Tr. at  630.

During a follow-up examination on August 26, 2011, Dr. Mendoza noted that Plaintiff was doing pool exercises at home and had no fatigue. Tr. at  702.  An examination revealed that Plaintiff's posterior spine was tender with paravertebral muscle spasms and thoracic and lumbosacral tenderness. Tr. at 703. Dr. Mendoza assessed Plaintiff with neck pain and back pain. Tr. at 704.

On September 27,  2011, Ms. Cooney assigned Plaintiff a GAF score of 55, but acknowledged Plaintiff's continued use of opiates, alcohol, and other illicit drugs after having negative mental health consequences. Tr. at 665.

### B.     State Agency Assessments

State agency disability physician Leslie Green, M.D., assessed Plaintiff's physical abilities based on his medical history. Tr. 522-529. Dr. Green opined that Plaintiff could occasionally or frequently lift and/or carry up to ten pounds, could stand and/or walk about six hours in an

eight-hour work day, and sit for a total of about six hours in an eight-hour work day. Tr. at 523. Dr. Green further opined Plaintiff would be limited in pushing or pulling with his extremities. Tr. 523-524. She found that Plaintiff could never climb ladders, ropes, or scaffolds; frequently balance; and occasionally crawl. Tr. at 524. She opined that Plaintiff could not reach overhead or look overhead, and that he could occasionally reach and feel with his left hand. Tr. at 525. She further opined that Plaintiff should avoid concentrated exposure to extreme heat and cold, vibration, and even moderate exposure to workplace hazards. Tr. at 526.

State agency disability psychologist Catherine Flynn, Psy.D., assessed Plaintiff's mental abilities based upon his medical history. Tr. at 598-610. Dr. Flynn opined that Plaintiff did not meet a listed impairment, as he was only mildly restricted in his activities of daily living, and in maintaining social functioning, or concentration, persistence, or pace, and that he had no episodes of decompensation of extended duration. Tr. at 608. She further opined that Plaintiff's depression and somatoform disorder (chronic pain syndrome) "do not impose significant functional limitations" and that he had no severe psychiatric impairments. Tr. at 610.

### C.     Hearing testimony

At the hearing, Plaintiff testified that he believes he is disabled because he "need[s] to sit down and stand up pretty much all day, back and forth, because if [he doesn't, his] leg likes to go numb. And [his] neck hurts to where it goes down [his] neck into [his] left shoulder." Tr. at 30. Plaintiff further testified that he arises at 4:30 a.m., takes Flexiril (a muscle relaxer recently prescribed) and then returns to bed between 5:30 and 6:00 a.m. Tr. at 32.  He naps for an hour or two. He tries to eat toast because he takes his Lyrica and Cymbalta in the morning. The remainder of the day, he "walk[s] around a lot, [he] sit[s] down, [he] walk[s], he lay[s] down. Pretty much just wander[s] around the house." Tr. at 32.  If it is nice outside, he walks around his cul de sac. He eats dinner, talks, goes for a walk, then watches television with his wife when she returns from work, and he retires at 10:00 p.m. Tr. at 32. He is prescribed Zanaflex as a sleep aid.

Plaintiff testified that he is prescribed Cymbalta for "[his] attitude." Tr. at 33. He further testified that he does not "interact with others well." Tr. at 34.  He explained that he became a truck driver due to his inability to deal with people. When asked about his back pain, Plaintiff identified

-11-

his low back. Plaintiff testified that his pain waxes and wanes, depending on the weather and his attitude. Tr. at 35. He can sit between five and fifteen minutes depending upon whether he can stretch his legs. Tr. at 35. He can walk thirty to forty minutes. Plaintiff lies down three or four times per day, for roughly one half of an hour. Tr. at 35-36.

Plaintiff is right handed. His right hand is good "most of the time" (it swells sometimes) while his left arm and hand are sore but are also "good most of the time." Tr. at 36. Plaintiff also suffers from carpal tunnel syndrome and migraine headaches, which occur two to three times per week lasting from a few hours to an entire day. Tr. at 37. He does not drive. Tr. at 30.

The only treatment Plaintiff identified for his neck pain was a TENS unit. Tr. at 37. He testified that the TENS unit helped him sit a little longer, and "not hurt so bad when [he] get[s] up." Tr. at 38. Plaintiff was prescribed Percocet, but testified that he stopped taking it in June because he could no longer afford it. Tr. at 39. Plaintiff explained that the VA declined to provide it because "[t]he VA doesn't believe in giving Percocets for headaches." Tr. at 40.

In addition to his testimony at trial, Plaintiff submitted a pain questionnaire and function report on July 7, 2010, as part of his disability filings, in which he stated that he could perform light housekeeping chores without assistance, including washing laundry and dishes, and vacuuming. Tr. at 223, 227. Plaintiff also let out and fed the family dogs. Tr. at 226. Other than having difficulty with buttons, Plaintiff could manage his own personal care. Tr. at 226. He went shopping for food once per week for about an hour at a time. Tr. at 228. He watched television or sat on a swing for about two hours per day. Tr. at 229.

### D.     The ALJ's Decision

In his Decision, the ALJ relied upon the objective medical evidence in the record to conclude that Plaintiff is not disabled. He gave great weight to the opinions of the agency physicians and the ME's testimony at the hearing. With respect to the fibromyalgia questionnaire completed by Dr. Mendoza, the ALJ wrote:

> As a treating physician, this opinion would normally be entitled to controlling weight, but this opinion is not consistent with the physician's own treating records or the whole of the medical evidence. [The ME] criticized this opinion, finding that throughout the medical community accepted treatment recommendations for fibromyalgia include *increasing* physical activity, not decreasing activity. I find that

-12-

> this opinion can be afforded minimal weight, based on the whole of the evidence regarding [Plaintiff's] retained daily functioning and considering [the ME's] expert testimony.

Tr. at 18. The ALJ also discredited Plaintiff's subjective complaints of debilitating pain and alleged limitations based upon the observations of treating sources in the record that Plaintiff's claims were rooted in his desire to avoid his financial obligations.

### E.     Treating Physician Rule

Plaintiff's first and second arguments in this appeal are predicated upon, or at least related to, the treating physician's rule.  An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.   A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007).  If  that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Commisioner of Social*

-13-

*Security,* 378 F.3d 541, 544 (6th Cir.2004) quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Commisioner of Social Security,* 486 F.3d 234, 243 (6th Cir.2007), citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377. However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n. 3 (6th Cir.2007) (quoting Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed.2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir.1988)). The Sixth Circuit has recognized that CT scans, X-rays, and minor abnormalities

-14-

"are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.*; see also *Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion". *Id.* at 818. Accordingly, "[o]pinions that focus solely upon objective evidence are not particularly relevant" due to the "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245.

Here, the ALJ clearly articulated his reasons for rejecting the opinion of Dr. Mendoza. First, the ALJ concluded that Dr. Mendoza's opinion was contravened by his own treatment notes, which do not contain a diagnosis of fibromyalgia. To the contrary, Dr. Mendoza's notes include benign findings when trigger point tests were administered. Furthermore, no physician in the record diagnosed Plaintiff with the syndrome. In his reply brief, Plaintiff contends that the foregoing arguments constitute "speculative post hoc rationalizations," ECF Dkt. #17 at p. 3, however, the ALJ clearly stated that Dr. Mendoza's opinion was unsupported by his own treatment notes and the evidence in the record as a whole.

It is important to note, however, that the ALJ also relied in error on the ME's statement that the treatment for fibromyalgia is increased activity, and, therefore, a diagnosis of fibromyalgia cannot constitute a disabling condition. Nonetheless, because the ALJ also relied on the absence of a fibromyalgia diagnosis in Dr. Mendoza's medical notes, and the medical notes of all of the other treating physicians, the ALJ's reliance on the ME's statement constitutes harmless error.

The Sixth Circuit recognized in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541(6th Cir.2004) that, in some circumstances, a violation of the treating physician rule might be "harmless error" if (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2) – the provision of the procedural safeguard of reasons – even though he has not complied with the terms of the regulation." *Id.* at 547. "If the ALJ's opinion permits the claimant and a reviewing court a

clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010), unpublished.

As previously stated, there exists no diagnosis of fibromyalgia in the record likely due to the fact that trigger point tests yielded normal results. Accordingly, the ALJ did not violate the treating physician rule when he afforded no weight to the opinion of Dr. Mendoza.

### F. Social functioning restriction

In his third argument, Plaintiff contends that the ALJ erred in limiting his exposure to the public without a similar limitation relating to supervisors and coworkers. Plaintiff contends that the ALJ relied upon the fact that he did not have difficulty with others during past employment, despite the fact that the record establishes that Plaintiff was hostile towards his treating physician. Plaintiff argues that his difficulty with people extends beyond the public and that the RFC should have included a limitation on exposure to supervisors and coworkers.

Plaintiff's mental health records show he was typically well groomed and talkative, with a logical, goal-directed thought process, and insight/judgment that ranged from fair to good. Tr. at 18, 463, 486, 493, 500, 630. Even Plaintiff reported that he could manage his moods with medications Tr. at 463. In June of 2011, Plaintiff was noted to be "making good progress in mood management by use of medications and therapy" and made "no reports of anger outbursts." Tr. at 630. He was assigned a GAF score of 55 at that time, denoting only moderate symptoms. Tr. at 630. Accordingly, substantial evidence supports the ALJ's determination of Plaintiff's mental limitations.

### G. Failure to Proffer

Next, Plaintiff contends that the ALJ ordered the VE to provide a synopsis of the documents that he relied upon at the hearing to Plaintiff, but that the VE never produced the synopsis. At the hearing, the VE objected to the production of the documents but agreed to provide a synopsis. Tr. at 67. After the hearing, counsel for Plaintiff sent a written request to the ALJ for the documents themselves, or, in the alternative, the synopsis. Plaintiff's counsel objected to the VE's testimony in its entirety since the documents or the written summary had not been provided.

Here, Plaintiff's counsel had ample opportunity to cross-examine the VE Although 42 U.S.C. § 405(b)(1) requires that the Commissioner discuss the evidence considered in reaching an unfavorable decision on a claim, it does not establish a right to discovery by Plaintiff, or to the production of the notes of a witness who testified at a claimant's hearing. The documents sought by Plaintiff were not reviewed by the ALJ in reaching his conclusion and, thus, there is no requirement that they be made part of the record under section 405(b). The VE's testimony, which is part of the record, is all the ALJ relied upon with regard to vocational evidence, and was discussed in the underlying decision in accordance with section 405(b). Accordingly, Plaintiff's fourth argument is not well-taken.

### I. The DOT

In his final argument, Plaintiff contends that the ALJ erred in failing to verify that the VE's testimony was consistent with the DOT. Although Social Security Ruling 00-4p imposes a duty upon the ALJ to inquire whether the VE's testimony is consistent with the DOT, where there is no actual conflict between a VE's testimony and the DOT, courts within this circuit have found that the ALJ's failure to make such an inquiry amounts to harmless error. *Stull v. Astrue*, No. 3:10CV00693, 2011 WL 830633, at *7-9 (N.D.Ohio Jan.18, 2011) (White, J.), report and recommendation adopted 2011 WL 830541 (Mar. 3, 2011); *Bratton v. Astrue*, No. 2:06–0075, 2010 WL 2901856, at *4 (M.D.Tenn. July 19, 2010); *Walton v. Comm'r of Soc. Sec.*, No. 08–13273, 2009 WL 2905952, at *9 (E.D.Mich. Sept.8, 2009). Furthermore, the Court notes that during Plaintiff's cross examination of the VE, counsel did not assert any inconsistencies between the VE's testimony and the DOT. "If counsel believed that there was an actual conflict between the VE's testimony and the DOT, he should have explored the matter at the hearing rather than first complaining upon judicial review." *Bennett v. Astrue*, 2008 WL 345523, at *6. As the Sixth Circuit has explained, the ALJ is not required to conduct its own investigation into the accuracy of the VE's testimony, "especially when the claimant fails to bring any conflict to the attention of the administrative law judge." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir.2008). Accordingly, the Court finds that the ALJ's failure to strictly adhere to the mandates of Social Security Ruling 00-4p does not necessitate remand.

Plaintiff contends that the usher and automatic car-wash attendant occupations require frequent reaching, and the automatic car-wash attendant occupation requires exposure to high concentrations of weather extremes, according to the DOT. Plaintiff also asserts that the greeter occupation is obsolete.

In fact, Plaintiff resolved any conflicts between the VE testimony and the DOT on cross-examination of the VE with regard to the automatic car-wash attendant position. Plaintiff's counsel specifically asked whether or not the automatic car-wash attendant position would require overhead reaching, which the RFC prohibited. Tr. at 58. The VE responded that, based upon his research and experience, positions existed in this classification that did not require overhead reaching. Tr. at 58. In addition, when Plaintiff's counsel asked whether the automatic car-wash attendant position required exposure to temperature extremes, which was also limited by Plaintiff's RFC, the VE testified that individuals employed in this position worked primarily in a booth, and would "very rarely" be outside that booth Tr. at 64-65. Thus, the Plaintiff adduced testimony from the VE resolving any conflict with the DOT regarding both the usher and automatic car-wash attendant positions.

Lastly, Plaintiff asserts that the greeter occupation is an obsolete position. In *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988), the Sixth Circuit found that 1,350 positions constituted a significant numbers of jobs in local and national economy. See also *Stewart v. Sullivan*, No. 89-6242, 1990 WL 75248, at *4 (6th Cir. June 6, 1990), cited in *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999)(125 jobs in local geographic area and 400,000 jobs nationwide constituted "significant number of jobs" within the meaning of 42 U.S.C. § 423(d)(2)(A)). More recently, in *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574 (6th Cir. 2009), the Sixth Circuit found that "the ALJ's count of 2,000 jobs [for one position] available in the third category withstands Nejat's challenge." Id. at 579. Based on existing case law, the number of jobs available according to the VE's testimony constitutes a "significant number of jobs." See, e.g. *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375 (6th Cir. 2006) ("870 jobs can constitute a significant number in the geographic region."). Here, the VE testified that there were approximately 1,700 usher and automatic car-wash attendant positions in the local economy, 9,000 combined positions in the state

economy and 200,000 combined positions in the national economy. Tr. at 20, 54-55. Accordingly, even removing the greeter position, the VE still identified positions Plaintiff could perform that exist in significant numbers in the national economy.

## **VI. CONCLUSION**

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: September 12, 2014

                                                */s/George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE